

RMY: USA02015R0071



FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

2016 AUG 11  PM 4: 11

CLERK'S OFFICE
AT BALTIMORE

BY _____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | * |
| **MOHAMMAD SHAFIQ, and** | * |
| **ALIA SHAHEEN,** | * |
| | * |
| | * |
| **Defendants** | * |
| | * |
| | * |
| | * |

CRIMINAL NO. RDB-16-0406

(Conspiracy to Commit Food Stamp
and Wire Fraud, 18 U.S.C. § 371; Food
Stamp Fraud, 7 U.S.C. § 2024(b); Wire
Fraud, 18 U.S.C. § 1343; Aiding and
Abetting, 18 U.S.C. § 2; Forfeiture, 18
U.S.C. §§ 981(a)(1)(C), 21 U.S.C.
§ 853, and 28 U.S.C. § 2461(c))

\*\*\*\*\*\*\*

## INDICTMENT

### COUNTS ONE
(Conspiracy to Commit Food Stamp and Wire Fraud)

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times relevant to this Indictment:

1. Defendant **MOHAMMAD SHAFIQ ("SHAFIQ")** was a resident of Maryland.

2. Family Member A was married to **SHAFIQ** and a resident of Maryland.

3. Defendant **ALIA SHAHEEN ("SHAHEEN")** was the adult child of **SHAFIQ**
and Family Member A and a resident of Maryland.

4. Family Member B was the adult child of **SHAFIQ** and Family Member A and a
resident of Maryland.

### The Food Stamp Program/Supplemental Nutrition Assistance Program

5. Congress passed the Food Stamp Act of 1977, which was later renamed the
Supplemental Nutrition Assistance Program ("SNAP"), in an effort to alleviate hunger and

1

malnutrition. The program used federal tax dollars to subsidize low-income households, which permitted those households to obtain a more nutritious diet by increasing the food purchasing power of eligible persons. SNAP was jointly administered by the United States Department of Agriculture ("USDA") and the Food and Nutrition Service ("FNS") together with various state agencies.

6. Title 7 of the Code of Federal Regulations, Section 278.2(a), prohibited an authorized retail food store from accepting food stamp coupons in exchange for cash. Further, Title 7 of the Code of Federal Regulations, Sections 278.2(a) and (h) provided that food stamp coupons may "only be accepted from eligible households or the households' authorized representative, and only in exchange for eligible food." Title 7 of the Code of Federal Regulations, Section 271.2 provided that food stamp coupons included "an electronic benefit transfer card or personal identification number issued pursuant to the provisions of the Food Stamp Act of 1977, as amended, for the purchase of eligible food."

7. In Maryland, SNAP was administered by the Maryland Department of Human Resources ("DHR") and was known as the Food Supplement Program ("FSP"). Maryland implemented FSP, funded by SNAP, through an Electronic Benefits Transfer ("EBT") system. FSP customers were issued plastic EBT Cards which contained an embedded magnetic stripe that stored basic information required for food purchases. Retailers approved by FNS to accept SNAP were assigned an FNS authorization number and, in some cases, were provided with a point of sale ("POS") device to access the electronic funds allocated to customer's EBT Cards. POS devices communicated with the Maryland EBT central database to debit a customer's available SNAP benefit balance for the cash value of eligible food items purchased.

2

8.      Under the FSP, benefits were automatically added to a recipient's EBT Card on a monthly basis. When an EBT Card was swiped through a retailer's POS terminal, the swipe caused an electronic transmission of information through a series of network switches to the central Maryland EBT database located in Texas, which contained customer account balance information. The EBT contractor verified the retailer was authorized to conduct SNAP EBT transactions. The Maryland EBT system verified the amount of benefits available, authorized the transaction, and deducted the purchase amount from the customer's available balance. The system also calculated cumulative FSP sales for each retailer and authorized electronic payments to the retailer's bank account.

9.      Once the EBT was approved, information flowed back to the POS terminal and the store employee received confirmation that the cardholder's account had been successfully debited. FSP EBT transactions were made for the exact amount of the sale and no change was given to the cardholder. SNAP reimbursements were paid to authorized retailers through a series of electronic funds transfers. On a daily basis, the EBT contractor, located in Austin, Texas, reconciled accounts for participating SNAP retailers in Maryland.

10.     In order to participate in the SNAP as an authorized retailer, a business submitted FNS Form 252, Food Stamp Program Application for Stores to FNS. As part of that application, the store owner/manager certified that they understood and agreed that "trade[ing] cash for Supplemental Nutrition Assistance Program benefits" was a "violation" of SNAP regulations.

11.     In order to receive SNAP reimbursements, authorized retailers were required to establish a single authorized bank account, approved by FNS, into which EBT benefits from legitimate food stamp transactions would be deposited.

3

**Shafiq and Shaheen's Participation in the Food Stamp Program**

12.     Quick Stop Convenience Store ("Quick Stop") was a convenience store located in Baltimore, Maryland. **SHAFIQ** was a 50% owner and resident agent of the business. Family Member A owned the other 50% of Quick Stop.

13.     New York Food Mart was a convenience store located in Baltimore, Maryland. Family Member B was the owner and resident agent of New York Food Mart.

14.     Barclay Food Mart, Inc., d/b/a A Plus Grocery ("Barclay"), was a convenience store located in Baltimore, Maryland. **SHAHEEN** was the owner and resident agent of Barclay.

15.     Shafiq Corporation was a convenience store located in Baltimore, Maryland. Family Member A was the owner and resident agent of Shafiq Corporation.

16.     One Stop Convenience Store ("One Stop") was a convenience store located in Baltimore, Maryland. **SHAFIQ** was the owner and resident agent of One Stop.

17.     Decker Convinent Store, LLC, d/b/a Decker Street Convenience Store ("Decker"), was a convenience store located in Baltimore, Maryland. Family Member B was the owner and resident agent of Decker.

18.     Malik Food Mart ("Malik") was a convenience store located in Baltimore, Maryland. Family Member A was the owner and resident agent of Malik.

19.     **SHAFIQ** and **SHAHEEN**, by and through and with Family Members A and B, owned and helped to operate Quick Stop, New York Food Mart, Barclay, Shafiq Corporation, One Stop, Decker, and Malik.

20.     On or about August 30, 2010, Family Member A submitted an FNS Form 252 for Quick Stop to FNS. As part of that application, Family Member A submitted a form certifying

4

that they understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

21.     On or about October 4, 2010, Quick Stop was licensed by FNS to participate in the food stamp program as a SNAP retailer.

22.     On or about June 27, 2011, Family Member B submitted an FNS Form 252 for Decker to FNS.  As part of that application, Family Member B submitted a form certifying that they understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

23.     On or about July 21, 2011, Decker was licensed by FNS to participate in the food stamp program as a SNAP retailer.

24.     On or about March 15, 2013, **SHAFIQ** sold a convenience store business located in Baltimore, Maryland to Family Member B, who named it "New York Food Mart."

25.     On or about August 2013, Family Member A submitted an FNS Form 252 for Malik to FNS.  As part of that application, Family Member A submitted a form certifying that they understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

26.     On or about November 4, 2013, Malik was licensed by FNS to participate in the food stamp program as a SNAP retailer.

27.     On or about January 14, 2015, Family Member B submitted an FNS Form 252 for New York Food Mart.  As part of the application, Family Member B submitted a form certifying that they understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

5

28.     On or about April 20, 2015, New York Food Mart was licensed by FNS to participate in the food stamp program as a SNAP retailer.

29.     In or about April 2015, Malik closed for business after being destroyed by a fire during a riot in Baltimore, Maryland.

30.     On or about April 27, 2015, **SHAHEEN** submitted an FNS Form 252 for Barclay. As part of the application, **SHAHEEN** submitted a form certifying that she understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

31.     On or about June 30, 2015, Barclay was licensed by FNS to participate in the food stamp program as a SNAP retailer.

32.     In or about September 2015, Decker was withdrawn from the Food Stamp Program, and a store under a new owner was authorized at the same location as Decker.

33.     On or about November 12, 2015, **SHAFIQ** submitted an FNS Form 252 for One Stop. As part of the application, **SHAFIQ** submitted a form certifying that he understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

34.     On or about November 12, 2015, Family Member A submitted an FNS Form 252 for Shafiq Corporation. As part of the application, Family Member A submitted a form certifying that she understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

35.     On or about November 30, 2015, One Stop was licensed by FNS to participate in the food stamp program as a SNAP retailer.

6

36.     On or about January 13, 2016, Shafiq Corporation was licensed by FNS to participate in the food stamp program as a SNAP retailer.

37.     On June 22, 2016, **SHAFIQ** submitted two FNS Forms 252 for "Kenyon Market" and "Malik Market," two convenience stores located in Baltimore, Maryland. As part of these applications, **SHAFIQ** twice submitted a form certifying that he understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

38.     From in or about October 2010 through July 2016, **SHAFIQ** and **SHAHEEN** routinely redeemed and caused to be redeemed EBT benefits in exchange for cash in violation of the food stamp program rules and regulations. As a result of these unlawful cash transactions, **SHAFIQ** and **SHAHEEN**, by and through their family members, received more than $3.7 million in EBT deposits for food sales that never occurred or were substantially inflated. **SHAFIQ** and **SHAHEEN** knew that exchanging cash for EBT benefits was in violation of the laws, rules and regulations regarding the food stamp program and that they, and their family members, were consequently not entitled to the EBT deposits made by FNS into accounts controlled by **SHAFIQ**, **SHAHEEN** and Family Members A and B.

## The Scheme to Defraud

39.     From in or about October 2010 through in or about July 2016, and on or about the dates enumerated below, in the District of Maryland, the defendants,

**MOHAMMAD SHAFIQ,** and
**ALIA SHAHEEN,**

knowingly and willfully devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions from SNAP, a federally funded national

7

malnutrition program jointly administered by USDA and FNS, together with various state agencies ("the scheme to defraud").

<strong>The Conspiracy to Defraud</strong>

40.     From in or about October 2010 through in or about July 2016, in the District of Maryland and elsewhere, the defendants,

<strong>MOHAMMAD SHAFIQ,</strong> and<br><strong>ALIA SHAHEEN,</strong>

did knowingly and willfully conspire and agree with each other, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to knowingly use, acquire, and possess food stamp coupons, through an EBT Card, having a value in excess of $100 in a manner contrary to the Food Stamp Act (Title 7, United States Code Section 2011, et seq.) and the regulations issued pursuant to that program in that the defendants, directly and indirectly, purchased food stamp benefits for cash, in violation of Title 7, United States Code, Section 2024(b), and

b.     to knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signals, pictures and sounds in violation of Title 18, United States Code, Section 1343.

<strong>The Object of the Conspiracy and Scheme to Defraud</strong>

41.     It was the object of the conspiracy and scheme to defraud that **SHAFIQ** and **SHAHEEN** and others would debit funds from EBT Cards and pay the individual who had

8

presented the EBT Card in cash at less than full value. Typically, **SHAFIQ** and **SHAHEEN** and others paid the individual who had presented the EBT Card half the value of the amount they had debited in cash. To avoid detection, **SHAFIQ** and **SHAHEEN** and others would also debit the funds off the card in multiple transactions over a period of hours or days. By executing the scheme to defraud, **SHAFIQ** and **SHAHEEN**, by and through family members, received at least $3.7 million in EBT deposits for food sales that never actually occurred or were substantially inflated.

### Manner and Means of the Conspiracy and Scheme to Defraud

42.     It was part of the conspiracy and scheme to defraud that the defendant and others created Maryland corporations for the purpose of operating convenience stores that participated in the SNAP program in Baltimore, Maryland.

43.     It was further part of the conspiracy and scheme to defraud that **SHAFIQ** and **SHAHEEN** and his family members, including Family Members A and B, applied to participate in the SNAP program.

44.     It was further part of the conspiracy and scheme to defraud that Quick Stop, New York Food Mart, Barclay, Shafiq Corporation, One Stop, Decker, and Malik, through **SHAFIQ**, **SHAHEEN**, and Family Members A and B, were authorized to participate in the SNAP program.

45.     It was further part of the conspiracy and scheme to defraud that **SHAFIQ**, **SHAHEEN**, and Family Members A and B opened bank accounts for the purpose of receiving SNAP benefits.

46.     It was further part of the conspiracy and scheme to defraud that **SHAFIQ**, **SHAHEEN**, and others caused EBT point of sale devices in Maryland to electronically transmit

interstate requests to authorize transactions and deduct amounts from EBT customers' available balances for unauthorized and unlawful purposes.

47.     It was further part of the conspiracy and scheme that **SHAFIQ**, **SHAHEEN**, and others caused the Maryland EBT System (through the EBT contractor) to electronically transmit an interstate signal that authorized electronic payment to the bank account of one of the convenience stores. Once the transaction was approved, information flowed back to the POS terminal confirming that the cardholder's account had been successfully debited.

48.     It was further part of the conspiracy and scheme to defraud that in order to avoid detection that **SHAFIQ**, **SHAHEEN**, and others debited and caused to be debited funds off an EBT card in multiple transactions over a period of hours or days to disguise the fraudulent nature of the transactions.

49.     It was further part of the conspiracy and scheme to defraud that **SHAFIQ**, **SHAHEEN**, and others falsely and fraudulently redeemed and caused to be redeemed from the United States government the full amount of the EBT food stamp benefits charged on the EBT cards and caused this money to be deposited into bank accounts controlled by **SHAFIQ**, **SHAHEEN**, and Family Members A and B.

### Overt Acts

50.     In furtherance of the conspiracy and scheme to defraud and to affect the objects thereof, at least one of the co-conspirators committed and caused to be committed, in the District of Maryland and elsewhere, at least one of the following overt acts:

a.     On or about October 11, 2011, **SHAFIQ** agreed to exchange $100 in cash for $200 in total EBT food stamp benefits at Quick Stop.

10

b.     On or about October 11, 2011, **SHAFIQ** informed an individual with EBT card ending in 2616, "I'm gonna apply $100 here and $100 at my other store."

c.     On or about October 11, 2011, **SHAFIQ** placed a call to Decker, and read the EBT card ending in 2616 and PIN to the person on the phone.

d.     On or about October 11, 2011, **SHAFIQ** conducted a swipe SNAP transaction for $94.35 at Quick Stop.

e.     On or about October 11, 2011, a co-conspirator conducted a manual SNAP transaction of $105.35 at Decker in exchange for $100 cash on EBT card number ending in 2616, for a total of $199.70 in unlawfully obtained EBT benefits.

f.     On or about July 19, 2012, **SHAHEEN** agreed to exchange $100 in cash for $200 in total EBT food stamp benefits at Quick Stop.

g.     On or about July 19, 2012, **SHAHEEN** placed a call to Decker and caused a co-conspirator to conduct a manual transaction of $102.84 on EBT card number ending in 2657 at Decker.

h.     On or about July 19, 2012, **SHAHEEN** conducted a swipe SNAP transaction for $98.58 at Quick Stop on EBT card number ending in 2657, for a total of $201.47 in unlawfully obtained EBT benefits.

i.     On or about November 26, 2013, Co-conspirator 1 agreed to exchange $50 in cash for $99.11 in EBT food stamp benefits on EBT card number ending in 2624 at Quick Stop.

j.     On or about July 11, 2014, Co-conspirator 1, while at Quick Stop, directed an individual holding EBT card ending in 6110 to go to Decker to exchange SNAP benefits for cash.

11

k.      On or about July 11, 2014, an individual holding EBT card ending in 6110 went to Decker where a Co-conspirator exchanged $60 cash for $119.93 in EBT food stamp benefits on EBT card number ending in 6110.

l.      On or about October 14, 2014, Co-conspirator 1 at Quick Stop directed an individual holding EBT card ending in 4619 to go to Decker to exchange SNAP benefits for cash.

m.      On or about October 14, 2014, the individual with EBT card ending in 4619 went to Decker and Co-conspirator 2 exchanged $70 cash for $139.69 in EBT food stamp benefits on EBT card number ending in 4619.

n.      On or about January 13, 2015, in the presence of **SHAFIQ** and Family Member A, Co-conspirator 2 agreed to exchange $100 cash for $199.67 in EBT benefits on EBT card number ending in 4643 at Decker.

o.      On or about January 13, 2015, in the presence of **SHAFIQ** and Family Member A, Co-conspirator 2 told the individual holding EBT card number ending in 4643 that he/she could exchange the remainder of his/her EBT balance for $115 cash.

p.      On or about January 13, 2015, in the presence of **SHAFIQ** and Family Member A, Co-conspirator 2 called Malik and Quick Stop to read the EBT card number from the individual with EBT card number ending in 4643 to facilitate a fraudulent food stamp transaction.

q.      On or about January 13, 2015, a co-conspirator at Malik caused a manual transaction of $99.79 on EBT card number ending in 4643.

r.      On or about January 13, 2015, a co-conspirator at Quick Stop conducted a manual transaction of $129.87 on EBT card number ending in 4643.

s.      On or about April 14, 2015, in the presence of **SHAFIQ**, Co-conspirator 2, while at Decker, exchanged $120 in cash for $244.42 in total EBT food stamp benefits on EBT card number ending in 4643, through a Decker swipe SNAP transaction of $129.35 and a Quick Stop manual transaction of $115.07.

t.      On or about April 14, 2015, Co-conspirator 3 exchanged $60 in cash for $121.43 in EBT food stamp benefits on EBT card number ending in 6110 at Malik by calling Quick Stop, relaying the EBT card number, and causing a manual transaction to occur on EBT card number ending in 6110 at the Quick Stop location.

u.      On or about July 10, 2015, co-conspirators exchanged $100 in cash for $201.74 in EBT food stamp benefits on EBT card number ending in 4643, through a Decker swipe transaction of $85.93 and a Barclay manual transaction of $115.81.

v.      On or about February 8, 2016, a co-conspirator at Barclay exchanged $50 cash for $101.49 in EBT food stamp benefits on EBT card number ending in 4687.

x.      On or about April 4, 2016, a co-conspirator at Shafiq Corporation exchanged $60 in cash for $121.49 in EBT food stamp benefits on EBT card number ending in 4643.

18 U.S.C. § 371

## COUNTS TWO AND THREE
### (Food Stamp Fraud)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 39 and 41 through 49 of Count One are incorporated here.

2.      On or about the dates below, in the District of Maryland and elsewhere, the defendants,

### MOHAMMAD SHAFIQ, and
### ALIA SHAHEEN,

did knowingly use, transfer, acquire and possess food stamp coupons, through an EBT Card, having a value in excess of $100 in a manner contrary to the Food Stamp Act (Title 7, United States Code Section 2011, et seq.) and the regulations issued pursuant to that program, that is, defendants **MOHAMMAD SHAFIQ** and **ALIA SHAHEEN** redeemed beneficiaries' electronic benefits for cash, as follows:

| COUNT | DATE | EBT TRANSACTION AMOUNT | CASH RECEIVED | STORES | DEFENDANT |
|---|---|---|---|---|---|
| 2 | October 11, 2011 | $199.70 | $100 | Quick Stop, Decker | **SHAFIQ** |
| 3 | July 19, 2012 | $201.42 | $100 | Quick Stop, Decker | **SHAHEEN** |

7 U.S.C. § 2024(b)(1)
18 U.S.C. § 2

14

## COUNTS FOUR and FIVE
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 39 and 41 through 49 of Count One are incorporated here.

2.      On or about the dates below, in the District of Maryland and elsewhere, the defendants,

### MOHAMMAD SHAFIQ, and
### ALIA SHAHEEN,

for the purpose of executing and attempting to execute the scheme to defraud, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, any writings, signs, pictures or sounds for the purpose of executing such scheme and artifice, that is, the defendants knowingly used and caused to be used a point of sale device inside Quick Stop and Decker to redeem beneficiaries' electronic benefits for unauthorized and unlawful purposes, which caused communications to be sent from a POS device in Maryland to Texas, as follows:

| COUNT | DATE | EBT TRANSACTION AMOUNT | CASH RECEIVED | STORES | DEFENDANT |
|---|---|---|---|---|---|
| 4 | October 11, 2011 | $199.70 | $100 | Quick Stop, Decker | SHAFIQ |
| 5 | July 19, 2012 | $201.42 | $100 | Quick Stop, Decker | SHAHEEN |

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE

The Grand Jury for the District of Maryland further finds that:

1.     Upon conviction of the offenses in violation of Title 18, United States Code,

Section 1343, as set forth in Counts Four and Five of this Indictment, the defendants,

**MOHAMMAD SHAFIQ,** and
**ALIA SHAHEEN,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c), any

property, real and personal, which constitutes and is derived from proceeds traceable to such

violations, including but not limited to a sum of money equal to the value of the proceeds of the

scheme to defraud as described in Paragraph 39 of Count One, which amount is at least

$3,712,353.00 million.

### Substitute Assets

2.     If, as a result of any act or omission of the defendants, any such property subject

to forfeiture:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third person;

    c.     has been placed beyond the jurisdiction of the Court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided
           without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture

of any other property of said defendants up to the value of the forfeitable property.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
28 U.S.C. § 2461(c)

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

A TRUE BILL:

_8/11/2016_
Date

SIGNATURE REDACTED

Foreperson

17